2023 IL App (1st) 220484-U

SECOND DIVISION
January 31, 2023

No. 1-22-0484

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| NELLY CABRERA, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 L 2553 |
| | ) | |
| WIREMASTERS, INC. d/b/a | ) | |
| W/M DISPLAY GROUP, | ) | Honorable |
| | ) | Preston Jones, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:   We affirm the judgment of the circuit court of Cook County granting defendant's motion to dismiss plaintiff's complaint for damages resulting from a workplace injury; plaintiff failed to raise a genuine dispute of fact as to whether plaintiff was a borrowed employee of the alleged borrowing employer such that the protections afforded the borrowing employer under the Workers' Compensation Act would not apply, and plaintiff failed to raise a genuine dispute of material fact as to whether the borrowing employer's willful and wanton conduct caused plaintiff's injuries.

¶ 2    Plaintiff, Nelly Cabrera, filed a complaint against defendant, Wiremasters, Inc., doing business as W/M Display Group (hereinafter "Wiremasters"), for damages resulting from injuries she sustained at work while operating a "press brake" machine for Wiremasters. Total Staffing Solutions, a temporary employment agency not a party to this appeal, employed plaintiff

and referred plaintiff to work at Wiremasters. Wiremasters filed a motion to dismiss plaintiff's complaint. In the motion Wiremasters alleged (1) plaintiff was a borrowed employee of Wiremasters and therefore the provisions of the Workers' Compensation Act bar a civil lawsuit by plaintiff against Wiremasters for her injuries and (2) the alleged acts that caused plaintiff's injury did not constitute willful and wanton conduct so as to exempt her lawsuit from the provisions of the Workers' Compensation Act. Following additional discovery after defendant filed its motion and the parties fully briefed the issues, the circuit court of Cook County granted defendant's motion. Plaintiff timely appealed.

¶ 3    For the following reasons, we affirm.

¶ 4                                    BACKGROUND

¶ 5    Inasmuch as this appeal is from an order granting a motion to dismiss plaintiff's complaint the following facts are taken from plaintiff's well-pled allegations.[1] On October 9, 2017, plaintiff was working on a "press brake machine" on defendant's property when plaintiff was injured resulting in permanent disfigurement. Prior to that date, Total Staffing Solutions, which is not a party to this appeal, had "hired [plaintiff] as a press operator whom [*sic*] did work on a [press brake machine]" and "placed here [*sic*] in the custody and control of [defendant] to work on the [press brake machine] amongst other machines." Count I of plaintiff's complaint claimed negligence on the part of defendant and alleged that the press brake machine "had a failed braking system," among other allegations related to negligence, and that defendant knew

---

[1]    "In ruling on a section 2-619 motion to dismiss, a court must interpret the pleadings and supporting materials in the light most favorable to the nonmoving party. [Citation.] '[A] court must accept as true all well-pled facts in the plaintiff's complaint and any reasonable inferences that arise from those facts.' [Citation.]" *Omega Demolition Corp. v. Illinois State Toll Highway Authority*, 2022 IL App (1st) 210158, ¶ 39.

or should have known the machine had been "maintained and/or repair [*sic*] and/or inspected in a negligent manner." Among other allegations of specific acts or omissions by defendant plaintiff alleged defendant "[c]arelessly and negligently trained, instructed, and supervised its employees in the operating of the [press brake machine.]" Count II of plaintiff's complaint claimed willful and wanton conduct on the part of defendant and again alleged that the press brake machine had a failed braking system and that the machine "had been constructed and/or installed and/or maintained  and/or repair [*sic*] and/or inspected in a negligent manner." Count II alleged defendant "[k]nowingly and intentionally trained, instructed, and supervised its employees in the operation" of the machine to disregard safety standards to increase production and knowingly and intentionally failed in the repair and inspection of the machine and the training of its employees regarding the machine. Plaintiff alleged that as a direct and proximate result of the aforementioned she suffered injuries.

¶ 6      Counts III and IV of plaintiff's complaint claim negligence and willful and wanton conduct, respectively, by Total Staffing Solutions. Both Count III and Count IV contain an allegation that Total Staffing Solutions "controlled the work, portions of the work, the production and/or production output of [defendant] and [plaintiff.] Counts III and IV allege Total Staffing Solutions was responsible for the maintenance of the machine and was negligent and acted knowingly or intentionally in failing that responsibility and in training plaintiff. Both counts also specifically allege that plaintiff's injury was not accidental, and occurred as a result of Total Staffing Solutions's willful and wanton conduct. (Plaintiff's complaint contains numerous other counts not at issue in this appeal against several entities that are not parties to this appeal, all of which relate to the injury caused by the press brake machine.)

¶ 7       On May 27, 2021, defendant filed a motion to dismiss pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2020)) on the ground that at all relevant times plaintiff was under the direct supervision and control of, and a borrowed employee of Wiremasters, as evidenced by certain testimony by plaintiff in her deposition and other record evidence. Defendant's motion to dismiss alleged that because Wiremasters was plaintiff's borrowing employer plaintiff's civil action is barred by the Workers' Compensation Act (Act) and that plaintiff has not alleged and cannot factually support a finding of any exception to the exclusive remedy provision of the Act.

¶ 8       The record evidence Wiremasters relied on in support of its motion to dismiss plaintiff's complaint included plaintiff's deposition testimony that Total Staffing was a temporary employment agency that provided persons to work for other businesses and no one from Total Staffing accompanied those persons to those businesses. Wiremasters employed plaintiff pursuant to a contract between Wiremasters and Total Staffing. Total Staffing did not tell plaintiff beforehand what work she would be doing at Wiremasters, did not train plaintiff how to do her work at Wiremasters, and did not tell plaintiff how to do her work at Wiremasters once plaintiff got there. Total Staffing did not tell plaintiff where or on what machine to work, what work she would be doing, or what tools she would be using. After Total Staffing assigned plaintiff to Wiremasters plaintiff never had to check in with Total Staffing, reported directly to Wiremasters, and was supervised by a Wiremasters employee (Luis Morales). Plaintiff "clocked" in and out of work with Wiremasters. Morales is the only person to instruct plaintiff, taking plaintiff from one machine to the next telling plaintiff how the machine worked. Wiremasters provided plaintiff with equipment (gloves) every day that plaintiff worked at Wiremasters. Plaintiff testified that plaintiff could not say that Wiremasters treated plaintiff any differently

than any other employee. A Wiremasters employee (Yolanda Quinones) also averred that no one from Total Staffing supervised plaintiff's work at Wiremasters.

¶ 9    Following full briefing by the parties and argument on the motion, the trial court found that plaintiff was a borrowed employee of Wiremasters at the time of the incident, therefore Wiremasters was entitled to protection from plaintiff's complaint under the Act; and the court found that Count II of plaintiff's complaint alleging willful and wanton conduct was barred by the exclusivity provision of the Act because plaintiff "failed to establish that her injuries were *not* accidental and the result of willful and wanton conduct." (Emphasis added.) On March 15, 2022, the trial court entered a written order granting Wiremasters's motion to dismiss with prejudice.

¶ 10    This appeal followed.

¶ 11                              ANALYSIS

¶ 12    Section 2-619(a)(9) permits a defendant to file a motion for dismissal of the action on the ground the claim is barred by affirmative matter defeating the claim. 735 ILCS 5/2-619(a)(9) (West 2020). An "affirmative matter defeating the claim" includes the absence of disputed issues of material fact such that the moving party is entitled to judgment as a matter of law. *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 16 ("The relevant question in assessing whether dismissal is proper under section 2-619 is whether a genuine issue of material fact exists that precludes dismissal or, in the absence of such an issue of fact, whether dismissal is proper as a matter of law."). In other words, "the motion will be granted if there exist no disputed issues of [material] fact." *Ericksen v. Rush Presbyterian St. Luke's Medical Center*, 289 Ill. App. 3d 159, 165 (1997). "If a cause of action is dismissed pursuant to a section 2-619 motion, the questions on appeal are (1) whether a genuine issue of material fact exists and (2)

whether the defendant is entitled to a judgement as a matter of law. [Citation.]" (Internal quotation marks omitted.) *Zurich Insurance Co. v. Amcast Industrial Corp.*, 318 Ill. App. 3d 330, 333 (2000). "The standard of review *** is *de novo*." *Arbogast*, 2021 IL App (1st) 210526, ¶ 16.

¶ 13    The dispositive "disputed issue of material fact" in this case is whether or not plaintiff was a borrowed employee of defendant under the Act. This issue is dispositive because:

> "The Act protects workers from accidental workplace injuries by imposing resulting liability on their employers, regardless of fault. [Citation.] In exchange, section 5(a) states as follows: 'No common law or statutory right to recover damages from the employer *** for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act.' [Citations.] This immunity applies to loaning and borrowing employers. [Citation.]" *Morales v. Herrera*, 2016 IL App (1st) 153540, ¶ 14.

¶ 14    Thus, if plaintiff was a borrowed employee of defendant, defendant is entitled to the immunity provided by the Act. There is no real dispute in this case that if plaintiff was a borrowed employee of defendant the judgment granting the motion to dismiss was proper unless defendant is not immune from plaintiff's civil suit under the Act because defendant's willful and wanton conduct caused the incident resulting in plaintiff's injury. This court's approach to loaned and borrowed employees is well-established:

> "Under Illinois' loaned employee doctrine, an employee in the general employment of one person may be loaned to another for the performance of special work and become the employee of the person to whom he is loaned.

[Citation.] Whether such a constructive transfer of employment occurs depends on whether the borrowing employer has the right to direct and control the employee with respect to the work performed and whether an employment contract, express or implied, existed between the employee and the borrowing employer. [Citation.]

The primary factor in determining a borrowed-employment relationship is the right to control the manner and direction of the subject employee's work. [Citations.] Other factors to be considered include the manner of hiring, the mode of payment, the nature of the work, the manner of direction and supervision of work, and the right to discharge. [Citations.] Additionally, the Illinois Supreme Court recognizes the threshold inquiry whether the employee actually or impliedly consented to work for the borrowing employer. [Citation.] Implied consent exists where the employee is aware that the borrowing employer 'is in charge' or generally controls the employee's performance. The employee's acceptance of the borrowing employer's direction shows his acquiescence to the employment situation. [Citation.]" *Crespo v. Weber Stephen Products Co.*, 275 Ill. App. 3d 638, 641 (1995) (citing, *inter alia*, *A.J. Johnson Paving Co. v. Industrial Comm'n,* 82 Ill. 2d 341 (1980)).

¶ 15    On appeal, plaintiff argues plaintiff was *not* a borrowed employee of defendant and was only employed by Total Staffing because (1) defendant did not have the right to control the manner in which plaintiff performed the work; (2) Total Staffing issued plaintiff's paychecks and paid for plaintiff's insurance, social security, and taxes; (3) Total Staffing had the right to discharge plaintiff; and (4) the written contract between Total Staffing and defendant shows that

plaintiff was an employee of Total Staffing and not defendant, plaintiff required no level of skill to perform the work, and plaintiff's length of service was short. "Whether a loaned employee status exists is generally a question of fact, but it constitutes a question of law if the facts are undisputed and capable of one inference." *Prodanic v. Grossinger City Autocorp, Inc.*, 2012 IL App (1st) 110993, ¶ 15.

¶ 16    We must construe the evidence liberally in plaintiff's favor. *Brennan v. Kadner*, 351 Ill. App. 3d 963, 967 (2004). Doing so in this case reveals there is no genuine issue of material fact and the evidence permits only one reasonable interpretation: plaintiff was defendant's borrowed employee. First, as to plaintiff's argument defendant did not have the right to control the manner in which plaintiff performed plaintiff's work, plaintiff relies on the claims that defendant never gave plaintiff any formal training on the machine plaintiff was injured on, never gave plaintiff a safety manual or employee handbook, and defendant had no safety procedures in place for the type of incident that injured plaintiff. Plaintiff also relies on a claim that Total Staffing set plaintiff's schedule.

¶ 17    We find there is no genuine dispute of material fact as to whether Total Staffing controlled plaintiff's work. The record evidence establishes that defendant controlled the manner and direction of plaintiff's work under tests for determining control found in our case law and because plaintiff's claim defendant never provided plaintiff with training on using the machine plaintiff worked on is positively rebutted by the record. As to plaintiff's training, plaintiff testified Luis Morales, who was defendant's direct employee and plaintiff's supervisor at Wiremasters, would "train me as I go," "machine by machine depending on where I got assigned." Plaintiff agreed that all training plaintiff received while at Wiremasters came from Morales, and Morales always trained plaintiff "just right there with a machine." No one from

Total Staffing told plaintiff what plaintiff was going to be doing or what machine plaintiff would be working on any given day. If plaintiff needed to change machines on a shift Morales would take plaintiff off one machine, put plaintiff on another machine, explain how the new machine worked, and plaintiff would start working. No one else showed plaintiff how any of the machines she worked on operated. Conversely, plaintiff testified Total Staffing did not provide plaintiff any training of any kind to do the work at Wiremasters nor did Total Staffing give plaintiff any training about their own "place or their own rules." Plaintiff did not recall receiving a handbook or safety book from Total Staffing.

¶ 18    Next, we note that defendant correctly cites *Prodanic*, 2012 IL App (1st) 110993, ¶ 16, for the alleged factors to consider when determining control. In *Prodanic*, this court noted as follows:

> "Our supreme court has found that the following factors support a determination that the borrowing employer had the right to control and direct the manner in which the employee performed the work: (1) the employee worked the same hours as the borrowing employer; (2) the employee received instruction from the borrowing employer's foreman and was assisted by the borrowing employer's employees; (3) the loaning employer's supervisors were not present; (4) the borrowing employer was permitted to tell the employee when to start and stop working; and (5) the loaning employer relinquished control of its equipment to the borrowing employer. *Id*. (citing *A.J. Johnson Paving Co.,* 82 Ill. 2d at 349).

¶ 19    Plaintiff speculated that primarily defendant's direct employees worked the first shift of the day and that primarily Total Staffing employees worked the second and last shift of the day but plaintiff could not say with certainty either that her assumptions were correct or that either

shift belonged exclusively to either set of employees. We will hold this one factor in plaintiff's favor, but the remaining three factors identified by our supreme court weigh in favor of finding that plaintiff was defendant's borrowed employee.

¶ 20    Plaintiff received instruction from, and only from, Morales, defendant's direct employee. The testimony does not suggest that any of the employees at Wiremasters worked together in their daily work. Total Staffing supervisors were not present at the work site. Defendant was permitted to tell plaintiff when to start and stop working. Although plaintiff may have said Total Staffing set her schedule, she clarified that Total Staffing would only ask whether plaintiff was working that day but then plaintiff would work the shift defendant established, *i.e.*, plaintiff's start and stop time. No equipment was involved in plaintiff's work for defendant (other than a pair of gloves Total Staffing gave plaintiff to use at Wiremasters on plaintiff's first day which could only be considered a relinquishment to Wiremasters). Plaintiff was asked whether her supervisor while she worked was a Total Staffing employee or defendant's employee and plaintiff testified "I couldn't tell the difference." Other than her belief that defendant's direct employees received benefits, plaintiff testified she could not tell the difference between defendant's employees and Total Staffing hires. Based on the record evidence, under *A.J. Johnson Paving Co.* we find that the only reasonable inference from the evidence is that defendant controlled the manner and direction of plaintiff's work.

¶ 21    Plaintiff's reliance on *Palomar v. Metropolitan Sanitary District of Greater Chicago*, 225 Ill. App. 3d 182 (1992), is misplaced. In *Palomar*, this court found a question of material fact existed as to whether the plaintiff was a borrowed employee within the meaning of the Act. *Palomar*, 225 Ill. App. 3d at 189. The *Palomar* court made its determination by weighing such "factors as the matter of hiring, the mode of payment, the right to discharge, and the manner or

direction of the services." (Internal quotation marks omitted.) *Palomar*, 225 Ill. App. 3d at 189

(quoting *Gundich v. Emerson-Comstock Co.*, 21 Ill. 2d 117, 123 (1960)). The *Palomar* court

found that in that case the parties disagreed with respect to the facts of the case and that

conflicting inferences could be drawn from the evidence. *Id*. at 190.

¶ 22     Plaintiff cites *Palomar* in support of the argument that Total Staffing controlled her work

because Total Staffing issued plaintiff's paychecks and paid her taxes. The *Palomar* court noted

that the plaintiff in *Palomar* argued that the plaintiff was not the alleged borrowing employer's

employee because the plaintiff "received his paychecks and W-2 forms from [the alleged loaning

employer]" while the defendant maintained that "although [the alleged loaning employer] paid

[the] plaintiff's wages, and deducted [the] plaintiff's taxes and social security *** it is clear ***

that [the alleged borrowing employer] was ultimately responsible for the payment of the same."

We concede a similar argument in this case but we do not find it dispositive of the issue. The

*Palomar* court did not discuss these specific facts related to payment in concluding that a

genuine issue of material fact existed concerning the issue of whether the plaintiff was a

borrowed employee pursuant to the Act. See *id*. at 190. Regardless, the *Palomar* court

acknowledged that "[t]he primary test for determining the existence of a loaned employer-

employee relationship is whether or not the alleged loaned employee is subject to the control and

direction of the borrowing employer." *Id*. at 189 (citing *M & M Electric Co. v. The Industrial

Comm'n*, 57 Ill. 2d 113, 116-17 (1974)). In this case, as demonstrated below the only reasonable

inference from the evidence is that plaintiff was subject to the control and direction of defendant.

¶ 23     First, as to plaintiff's specific reliance on the fact Total Staffing issued plaintiff's

paycheck and paid her taxes, that argument is not persuasive in light of the fact our supreme

court has "found it was irrelevant that the employee received his salary from the loaning

employer, rather than the borrowing employer." *Prodanic*, 2012 IL App (1st) 110993, ¶ 16 (citing *A.J. Johnson Paving Co.,* 82 Ill. 2d at 349). In *A.J. Johnson*, our supreme court concluded that an administrative finding that an employer-employee relationship existed was not against the manifest weight of the evidence and the court primarily supported that finding by discussing the borrowing employer's "right to control the manner of the work performed." See *A.J. Johnson Paving Co.*, 82 Ill. 2d at 349. In that context our supreme court found that "[t]he mere fact that the employee does not receive his wages from the special employer will not defeat the finding of a loaned-employee situation." *A. J. Johnson Paving Co.*, 82 Ill. 2d at 349.

¶ 24     We also note that in *Palomar*, the plaintiff testified the plaintiff's work was supervised and controlled solely by the alleged *loaning* employer and the plaintiff was only accountable to the alleged loaning employer and its agents, while the alleged borrowing employer testified it had the right to control the plaintiff's work pursuant to the parties' contract and that it did in fact do so in part because the plaintiff received work from the defendant's employees. *Id*. The opinion in *Palomar* does not specify precisely what either the alleged loaning or alleged borrowing employer told the employee.

¶ 25     In this case, we do not find the material facts to be in dispute or that conflicting inferences may be drawn from the evidence. There is no genuine dispute that defendant's employee Morales was the only person to direct plaintiff on the use of the various machines. No Total Staffing employees were present while plaintiff performed her work, therefore, plaintiff could not be accountable to Total Staffing while she worked. There is also no dispute plaintiff only received her work from Morales. Plaintiff testified Morales was the only person to tell plaintiff what machine to work on and what machine to move to once plaintiff completed using a particular machine for the day. See *O'Loughlin v. ServiceMaster Co. Limited Partnership*, 216

Ill. App. 3d 27, 37 (1991) (examining "the 'very nature' of [the] plaintiff's work" to determine whether borrowing employer controlled the plaintiff's work).

¶ 26      In *O'Loughlin*, the court cited *M & M Electric Co.*, 57 Ill. 2d at 118, for the proposition that because the borrower "could not control the manner of *** work, it had not become [a] borrowing employer." *O'Loughlin*, 216 Ill. App. 3d at 37 (citing *M & M Electric*, 57 Ill. 2d at 118). In *O'Loughlin*, the court found that the "very nature" of the plaintiff's work did not give the borrower control. *Id.* In this case, the very nature of the work plaintiff performed at Wiremasters required defendant to control the manner in which plaintiff performed her work. Unlike the employee in *O'Loughlin* plaintiff in this case could not complete her tasks if defendant did not tell her exactly what to do and how to do it at each machine. Finally, in this case, defendant is not relying solely on language in a contract but rather on the facts of what actually occurred in support of its argument plaintiff was defendant's borrowed employee. Compare *id.*

¶ 27      In this case, considering the primacy of the right to control plaintiff's work we find the mere fact that plaintiff did not receive wages from defendant but from Total Staffing is not enough to overcome the factor of control over plaintiff's work and other facts and circumstances based on which we find the only reasonable inference is that plaintiff was defendant's borrowed employee.

¶ 28      Turning to plaintiff's argument plaintiff was not a borrowed employee because Total Staffing had the right to discharge her, we note plaintiff admits defendant could ask that Total Staffing not assign plaintiff to work for defendant but plaintiff argues that power is not the same as the power to discharge. In support of that argument plaintiff relies on *O'Loughlin*, 216 Ill. App. 3d at 27. In *O'Loughlin*, the court declined to find a borrowed employment relationship in

part by rejecting the alleged borrowing employer's argument that it controlled the employee's work because it had "effective, *de facto*" power to hire and discharge the plaintiff even though the alleged loaning employer "retained formal power to hire and discharge" the employee. *O'Loughlin*, 216 Ill. App. 3d at 37. The court found that the evidence established only that the alleged borrowing employer had the authority to recommend the employee be discharged but that recommendation was subject to the approval of the loaning employer. The court also noted the borrowing employer had "never tested [this] 'effective' power by recommending that anyone be terminated." *Id*. The *O'Loughlin* court concluded that the employee could "point to neither a clear grant nor any exercise of independent authority on their part to hire or discharge an employee ***, whereas [the employee] had every reason to consider himself an employee of the [alleged loaning employer] and not of [the] defendants." *O'Loughlin*, 216 Ill. App. 3d at 40.

¶ 29    This case is distinguishable. Here, plaintiff does not have "every reason to consider [themself] an employee of [Wiremasters.]" Plaintiff reported to defendant's property to work. Defendant told plaintiff what plaintiff's shift would be. Defendant's employee was the only person to instruct plaintiff how to do their work. No one from Total Staffing was on site at Wiremasters when plaintiff worked. Most pertinent, the evidence in this case is distinguishable from *O'Loughlin* based on that court's recitation of the evidence. In *O'Loughlin*, the court stated the evidence was clearly that the alleged borrowing employer only "had the authority to recommend *** that [the] plaintiff be discharged" and asserted no more than a "*de facto* power" to discharge. See *O'Loughlin*, 216 Ill. App. 3d at 37. Plaintiff did testify that Total Staffing had the ability to fire plaintiff and on appeal plaintiff argues that defendant's employees only had the authority to recommend her termination. Plaintiff's basis for that assertion is the testimony of first-shift supervisor Juan Delgado and Vice President of Operations Robert Cummins.

- 14 -

¶ 30 In this case, however, Delgado's and Cummins's testimony implies joint responsibilities regarding discharging a Total Staffing employee rather than the more limited power to recommend discharge present in *O'Loughlin*. Delgado testified without qualification that he did "have the ability to fire individuals." Delgado also testified there was no difference between employees defendant hired and Total Staffing employees. Shortly thereafter, Delgado was asked the following questions and gave the following answers:

"Q. With respect to hiring and firing of the employees that came from Total Staffing, did you have the ability as a Wiremasters supervisor to fire employees that were hired by Total Staffing?

A. [over objection] Yes.

Q. You personally could terminate [plaintiff] *** without contacting Total Staffing; is that correct?

A. [over objection] I could not fire her directly. I had to call the office and let them know that we didn't need her any longer and why we didn't need her.

Q. So you as the supervisor at Wiremasters would not have been able to terminate [plaintiff] without having speaking [*sic*] to Total Staffing; is that correct?

A. [over objection] Yes. Any time you wanted to dismiss an employee that came through an agency, you had to contact the agency. Otherwise, they would send them back and then you would have to pay them."

¶ 31 We find the only reasonable inference from Delgado's testimony is that Total Staffing would process defendant's decision to terminate a Total Staffing employee by not returning the employee to defendant's work site and possibly (but not certainly) informing the employee in the

first instance. In any event, there is no reasonable inference that Total Staffing had to approve the discharge. The evidence implies the borrowing employer makes the decision whether or not they want the employee back, communicates that decision to the loaning employer, and then the loaning employer does not send the employee back. Nothing in Delgado's testimony suggests a right to approve defendant's decision nor, more importantly, a right to refuse defendant's decision. *Cf. id.*

¶ 32    Similarly, Cummins was asked the following questions and gave the following answers:

"Q. With respect to terminating employees, like a general laborer who was performing work on the press brake machine at issue, in terms of being able to terminate, Wiremasters was not able to terminate those employees unilaterally; is that correct?

A. You mean—what do you mean by unilaterally?

Q. What I mean is that if you were to have a reason to terminate an employee that came over from Total Staffing, you would have to communicate that to Total Staffing who would then actually fire the employee; is that correct?

A. Yes. The only time I would terminate someone, which I never had to do on the spot, was a safety issue, they were doing something unsafe and I didn't want them on the property anymore, then I would basically tell them to go home, and then I would call the staffing agency and say I don't want them back again.

Q. Got it. But in terms of actually discontinuing any employment or work being done by that individual at Wiremasters, that's something that Total Staffing would have to discharge them from. Would you agree?

A. Correct. I would call them and say I no longer want this employee here."

¶ 33    As with Delgado's testimony, nothing in Cummins's testimony gives rise to a reasonable inference that defendant's decision to have a Total Staffing employee not return to Wiremasters was subject to Total Solutions's approval (which necessarily implies Total Solution's power to disapprove). We find the only reasonable inference is that defendant made the actual decision to terminate, not subject to any approval. ("I would call them and say *I* no longer want this employee here." (Emphasis added.)) Defendant then communicated that decision to Total Staffing, who then would not, as a matter of necessity, return that employee to defendant's work site. Furthermore, Cummins testified unequivocally to an authority to terminate a Total Staffing employee for safety issues. Telling and supportive of our conclusion is that even when an employee was removed for a safety violation, Cummins testified defendant had the authority to do so instantly and "unilaterally" and defendant would still "call the staffing agency and say I don't want them back again." This similarity in process suggests the authority is the same for safety violations and discharge for other reasons: defendant makes the decision, communicates that decision to Total Staffing, and Total Staffing does not return the employee to defendant's work site. (Although not necessary to our holding, we can infer that the reason for this process is so that Total Staffing can find the employee a new placement rather than leading the employee to believe Total Staffing would not continue to place them at all.) But see *M & M Electric*, 57 Ill. 2d at 119 (citing *Densby v. Bartlett*, 318 Ill. 616, 620-621 (1925)) ("While there are undoubtedly areas of behavior which would justify Northwestern's removal of an M & M electrician from the plant, for instance, flagrant safety violations, this power does not amount to the power to discharge.")).

¶ 34    In sum, plaintiff's reliance on *O'Loughlin* is misplaced because the case is legally and factually distinguishable. Legally, defendant in this case can "point to *** a clear grant *** of independent authority on [defendant's] part to hire or discharge an employee." *Cf. O'Loughlin*, 216 Ill. App. 3d at 40. Factually, plaintiff did not have "every reason to consider [themselves] an employee of the [alleged loaning employer] and *not* of defendant's." (Emphasis added.) *Cf. id.* We find the only reasonable inference is that plaintiff was defendant's borrowed employee.

¶ 35    Next, plaintiff argues no express or implied contract existed between plaintiff and defendant. Plaintiff did not sign any agreements and plaintiff argues that no implied contract existed because plaintiff was not aware of the contract between Total Staffing and defendant. Plaintiff also testified to her belief that Total Staffing employed her based, in part, on the fact plaintiff did not receive benefits from defendant while defendant's employees did receive benefits.

¶ 36    "Our supreme court has stated that the inquiry required to determine whether a loaned-employee status exists is twofold: (1) whether the borrowing employer had the right to control and direct the manner in which the employee performed the work; and (2) whether a contract of hire existed between the borrowing employer and the employee. *Prodanic*, 2012 IL App (1st) 110993, ¶ 15 (citing *A.J. Johnson Paving Co.,* 82 Ill. 2d at 348). The contract may be express or implied, and "to establish such a contract there must be at least an implied acquiescence by the employee in the relationship." *A.J. Johnson Paving Co.*, 82 Ill. 2d at 350 (citing *McHugh-Brighton v. Industrial Comm'n*, 42 Ill. 2d 52 (1969)).

> "[A] n individual may be the general employee of one employer and the
> loaned employee of another, but he must consent to the new relationship.
> [Citation.] Implied consent exists where the employee knows that the borrowing

employer generally controls or is in charge of the employee's performance. [Citation.] Furthermore, the employee's acceptance of the borrowing employer's direction demonstrates the employee's acquiescence to the employment relationship. [Citation.]" *Prodanic*, 2012 IL App (1st) 110993, ¶ 15 (citing *A.J. Johnson Paving Co.,* 82 Ill. 2d at 348).

¶ 37    We find that pursuant to *A.J. Johnson Paving Co.*, the only reasonable inference that can be drawn from the evidence in this case is that plaintiff acquiesced to a loaning-borrowing employer relationship. Our supreme court has held that acquiescence can be established by the fact the employee was aware of the borrowing employer and complied with the borrowing employer's instructions with regard to starting, stopping, and break times; instructions on what to do; and other incidental directions as to the performance of the work. *A.J. Johnson Paving Co.*, 82 Ill. 2d at 350 (citing 1C A. Larson, Workmen's Compensation sec. 48.10, at 8-331 to 8-332 (1980)). In those circumstances, the court found that a finding of a borrowing employer relationship was not against the manifest weight of the evidence. *Id*. In this case, the facts are undisputed that plaintiff knew Total Staffing hired her to be sent to work elsewhere, plaintiff worked defendant's schedule and complied with Wiremasters's start, stop, and break times. Furthermore, this court has held that:

> "An employee's consent to the requisite contract of hire with the borrowing employer may be implied in the context of employment by a temporary employment agency. [Citation.] Indeed, courts have repeatedly held that a plaintiff's acceptance of an assignment from a temporary employment agency and awareness that he or she worked for the borrowing employer through the temporary employment agency amounted to implied consent to the borrowed-

employee relationship." *Torrijos v. International Paper Co.*, 2021 IL App (2d) 191150, ¶ 68.

¶ 38    In this case plaintiff accepted defendant's instruction as to what machine to work on, how much work to complete (based on the amount of raw material provided to plaintiff at each machine), and how to operate the machine. Moreover, plaintiff testified that through Total Staffing, plaintiff completed employment paperwork with defendant, Total Staffing instructed plaintiff to report to defendant's work site, plaintiff accepted this assignment, and plaintiff performed work for and at the direction of defendant. See *id.*

¶ 39    As in *Torrijos*, we find that "plaintiff impliedly consented to the borrowed-employee relationship." *Id.* See also 820 ILCS 305/1(a)(4) (West 2020) ("An employer whose business or enterprise or a substantial part thereof consists of hiring, procuring or furnishing employees to or for other employers operating under and subject to the provisions of this Act for the performance of the work of such other employers and who pays such employees their salary or wages notwithstanding that they are doing the work of such other employers shall be deemed a loaning employer within the meaning and provisions of this Section."); but see *Chaney ex rel. Chaney v. Yetter Manufacturing Co.*, 315 Ill. App. 3d 823, 828 (2000) (declining to adopt sole reliance on statute and proceeding to examine the traditional factors that define the loaned-employee and borrowing-employer relationship).

¶ 40    We also find that *Emma v. Norris*, 130 Ill. App. 2d 653 (1970), on which plaintiff relies for the proposition that plaintiff did not acquiesce to an employment relationship with defendant because she was unaware of the written agreement between Total Staffing and defendant, to be inapposite. First, the evidence amply supports and we have found the existence of an implied contract of employment, therefore, the written agreement is irrelevant. See *A.J. Johnson Paving*

*Co.,* 82 Ill. 2d at 350 (finding no merit to argument arbitrator erred in "excluding evidence of an agreement between the employers with respect to liability under the Act"). Second, this court has recognized that:

> "[T]he agreement between [the defendant] and [the temporary employment agency] has no bearing on [the] plaintiffs' implied contract for hire with [the defendant]. [Citation.] The loaned employee concept depends on a contract of hire 'between the employee and the special employer, not the details of the contract between the two employers.' [Citations.]" (Internal quotation marks omitted.) *Torrijos*, 2021 IL App (2d) 191150, ¶ 74.

Finally, the *Emma* court found that the evidence gave rise to conflicting inferences bearing on the issue of consent presenting a question of fact. *Emma*, 130 Ill. App. 3d at 658. We do not find the evidence conflicting in this case.

¶ 41    Based on the Act, this court's holdings in *Torrijos*, and the elements our supreme court articulated in *A.J. Paving Co.*, the only reasonable inference is that plaintiff acquiesced to an implied employment contract with defendant and that a borrowed employee relationship existed between plaintiff and defendant. Neither the level of skill required to work for defendant nor plaintiff's short tenure are sufficient to overcome the conclusion that plaintiff was defendant's borrowed employee. The material facts are not in dispute and the disputed facts are inapposite. Viewing the evidence in a light most favorable to plaintiff, the only reasonable inference from the evidence is that Total Staffing was a loaning employer and Wiremasters was a borrowing employer under the Act. Therefore, defendant is entitled to the limitations on liability provided under the Act; unless, defendant's conduct was willful and wanton, and plaintiff argues that it was.

¶ 42    Mere negligence does not remove an employer from the scope of the protections of the Act. *McKernin Exhibits, Inc. v. Industrial Comm'n*, 361 Ill. App. 3d 666, 671 (2005). "In order to remove the claimant from the protection of the Act, his actions must have been committed intentionally, with knowledge that they were likely to result in serious injury, or with a wanton disregard of the probable consequences." *Id*. A plaintiff may also escape the limitation on employer liability afforded by the Act by proving "either that the injury (1) was not accidental, (2) did not arise from his or her employment, (3) was not received during the course of employment or (4) was noncompensable under the Act." *Collier v. Wagner Castings Co.*, 81 Ill. 2d 229, 237 (1980). Plaintiff argues defendant's conduct was willful and wanton and not "accidental" within the meaning of the Act. Plaintiff asserts additional depositions will support a finding of willful and wanton conduct by defendant. As to defendant's alleged willful and wanton conduct, plaintiff argues evidence of willful and wanton conduct is that (1) defendant required employees to meet a quota working on the machines, (2) there had been prior complaints about the machine that injured plaintiff, (3) a maintenance technician had to receive instruction on how to adjust the machine that injured plaintiff, (4) defendant did not properly maintain the machine, and (5) defendant lacked a training system and had no procedures in place and was otherwise unprepared for the type of accident that injured plaintiff.

¶ 43    Taking plaintiff's assertions as true, the alleged "facts" on which plaintiff relies fall short of alleging willful and wanton conduct sufficient to remove defendant from the protection of the Act. This court has stated as follows:

>       "An injury is accidental within the meaning of the Act when it is traceable
>
>       to a definite time, place, and cause, and occurs in the course of the employment
>
>       unexpectedly and without affirmative act or design of the employee. [Citation.] In

the context of the Act, to show that an injury is not accidental, the employee must establish that his employer or co-employee acted deliberately and with specific intent to injure the employee. [Citations.] The *** court [has] quoted Professor Larson's treatise on workers' compensation law as follows:

> Even if the alleged conduct goes beyond aggravated negligence, and includes such elements of knowingly permitting a hazardous work condition to exist, knowingly ordering a claimant to perform an extremely dangerous job, willfully failing to furnish a safe place to work, or even willfully and unlawfully violating a safety statute, this still falls short of the kind of actual intention to injure that robs the injury of accidental character. [Citations.]" (Internal quotation marks omitted.) *Garland v. Morgan Stanley & Co., Inc.*, 2013 IL App (1st) 112121, ¶ 29.

¶ 44 Further, the *Garland* court rejected the plaintiff's request to modify this standard. This court reiterated:

> "This argument is unpersuasive where the case law is clear that, for an employee seeking to bypass the exclusive remedy of the Act, the employee must show that the employer specifically intended to injure the plaintiff. See, *e.g., Copass* [*v. Illinois Power Co.*]*,* 211 Ill. App. 3d [205,] 214 [(1991)] ('an employee alleging an intentional tort against his employer or co-employee must allege that the defendant acted deliberately with specific intent to injure the employee'); *Mayfield v. ACME Barrel Co.,* 258 Ill. App. 3d 32, 35 (1994) ('Whether an injury is accidental for the purposes of applying the Act is

dependent upon the object of the employer's intention. It is only when the
employer acts with [the] specific intent to injure the employee that the resultant
injury is stripped of its accidental character.'); *Bercaw v. Domino's Pizza, Inc.,*
258 Ill. App. 3d 211, 218 (1994) (agreeing with the *Copass* court 'that the
"specific intent to injure" test is in keeping with the basic purposes of the Act');
*Limanowski* [*Ashland Oil Co., Inc.*], 275 Ill. App. 3d [115,] 120 [(1995)]
(employee seeking to recover against employer must prove, by a preponderance
of the evidence, that the employer specifically intended to injure the plaintiff)."
*Garland*, 2013 IL App (1st) 112121, ¶ 30.

¶ 45 We reject plaintiff's argument that plaintiff's injury was not caused by an "accident."
Once again, "[a]n accident is anything that happens without design or an event unforeseen by the
person to whom it happened. Within the meaning of the Act, an injury is accidental when it is
traceable to a definite time, place, and cause and occurs in the course of employment without
affirmative act or design of the employee." *Elliott v. Industrial Comm'n of Illinois*, 303 Ill. App.
3d 185, 188 (1999) (citing *International Harvester Co. v. Industrial Comm'n,* 56 Ill. 2d 84, 88–
89 (1973)). Plaintiff's testimony establishes that this event was unforeseen and without
affirmative act or design by plaintiff. Plaintiff testified that plaintiff did not see the accident
occurring until it was too late and that plaintiff had never seen anything like the occurrence
happen before.

¶ 46 As for plaintiff's implied request for more time to complete depositions in an effort to
obtain evidence of willful and wanton conduct, we reject any such request. First, plaintiff does
not direct this court to a Rule 191(b) affidavit. *Kensington's Wine Auctioneers & Brokers, Inc. v.
John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 11 (2009) ("Supreme Court Rule 191(b) (145 Ill.

2d R. 191(b)) sets forth the procedure to be followed when a party believes that additional discovery is needed to properly respond to a section 2-619 motion to dismiss.") Nor does plaintiff allege what plaintiff believes any witnesses might testify to as well as the reason for that belief. *Kensington's Wine Auctioneers & Brokers, Inc.*, 392 Ill. App. 3d at 12 ("Laks's affidavit is thus facially defective because it fails to allege what she believes each of the defendants might testify to, as well as the reasons for her beliefs. Accordingly, the trial court did not err in granting defendants' motion to dismiss despite the presence of Laks's Rule 191(b) affidavit.")

¶ 47      Second, the evidence on file overwhelming establishes that plaintiff cannot show that defendant *intended* to injure plaintiff. See *Garland*, 2013 IL App (1st) 112121, ¶ 30. We find, considering the evidence in a light most favorable to plaintiff and accepting plaintiff's claims as true, the injury "was, at most, a terribly unfortunate accident caused by negligence." *Id*. (We note we are not making a finding that defendant was negligent; only that defendant's conduct did not rise to the level of willful and wanton conduct to remove defendant from the protection of the Act.) We find that "plaintiff failed to show defendant[], or anyone for that matter, acted deliberately with the specific intent to injure." *Id*. Accordingly, dismissal pursuant to section 2-619 was proper.

¶ 48                                    CONCLUSION

¶ 49      For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 50      Affirmed.